# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| | : | |
| v. | : | Crim. No. 11-337-5, -9 |
| | : | |
| ANGEL LUNAS, JR. | : | |
| ANTHONY ROEBUCK | : | |
| | : | |

Diamond, J.                                                                                                          June 5, 2013

## MEMORANDUM

On November 2, 2012, Philadelphia Police witnessed what they believed was a narcotics transaction involving Defendants Angel Lunas, Jr. and Anthony Roebuck. The officers stopped Defendants' car, searched Roebuck, and then searched the vehicle, seizing cocaine, crack cocaine, ammunition, and cash. Charged with drug offenses, Defendants have moved to suppress the physical evidence police recovered. Lunas also asks me to suppress his admissions to the police that he owned the car. The Government concedes that Lunas's statements were illegally obtained and should be suppressed. (Doc. No. 335.) For the reasons that follow, I will also suppress the physical evidence.

Having conducted an evidentiary hearing, I make the following findings and conclusions pursuant to Federal Rule of Criminal Procedure 12(d).

## FINDINGS OF FACT

At the suppression hearing, the Government called Philadelphia Police Officer Walter Bartle, and the Parties stipulated to the testimony of another officer. The Government introduced additional evidence, including area photographs and the warrant to search Defendants' car. Defendants called Mr. Terrence Goss. I find that the Government has proven the following facts by a preponderance of the evidence.

*Police Investigation*

On the evening of November 2, 2012, Officer Bartle was on undercover surveillance duty in the Hunting Park area of Philadelphia with Officers Nathan Ramos and Christopher Hulmes. (Hr'g Tr. 7:10-8:6, Jan. 14, 2013, Doc. No. 323.) Members of the Narcotics Strike Force, the three were assigned to investigate "open air narcotics sales." (Tr. 6:6-11.) Each had been a Philadelphia Police Officer for approximately 16 years and all were highly experienced in conducting narcotics investigations. (Tr. 6:1-3; 7:16-19.) Officer Bartle estimated he had participated in "at least 10,000 [narcotics] investigations" that led to arrests. (Tr. 9:6-8.)

At around 8:00 p.m., the officers parked their unmarked Buick near the intersection of Ruffner and Priscilla Streets. (Tr. 16:10, 27:6-7, 10:5-6.) There was snow on the ground; it was "clear and cold." (Tr. 11:7-9.) The officers were not responding to a tip and had no "specific information on a target or location." (Tr. 8:18-19.) They went to Hunting Park "with no other information other than [their] familiarity with this area and the past investigations [they] conducted in this area." (Tr. 8:22-25.) Officer Bartle estimated he had conducted around two dozen narcotics investigations in Hunting Park, and been involved in "investigations that have led to arrests" on Alfred Street, one block east of Priscilla. (Tr. 9:9-16; 61:14-16; 14:19-20.) Both the Alfred and Priscilla blocks are residential. (Tr. 58:13-18; 12:8-13:2.)

*Police First See Defendants*

Officer Ramos climbed onto a nearby rooftop to conduct general surveillance; Bartle and Hulmes remained in the Buick. (Tr. 12:20-23.) While waiting for Officer Ramos, Bartle noticed a white Volvo parked on Ruffner Street, about 100 feet away from the officers' Buick. (Tr. 16:1-7; 62:14-18.) There was nothing unusual or suspicious about the car; as Officer Bartle testified, "[i]t was dumb luck that I happened upon that Volvo that night." (Tr. 76:7-8.) He "had no idea"

how long the car had been parked on Ruffner Street. (Tr. 118:2-8.)

Lunas was in the driver's seat of the Volvo; Roebuck sat on the passenger's side. (Tr. 21:1-2; 17:11-13.) Officer Bartle saw Roebuck leave the Volvo and proceed to a walkway behind the homes on Alfred Street. (Tr. 17:11-18; 59:20-60:14; Gov. Ex. 6.) The officers had never conducted surveillance or made arrests in this back walkway area. (Tr. 60:18-21.) Although it was nighttime, there were overhead street lights and light emanating from the houses along the walkway. (Tr. 14:7-12.) Bartle and Hulmes could thus see the entrance to the walkway, but lost sight of Roebuck once he entered. (Tr. 20:1-12.) After ten minutes, Roebuck emerged from the walkway carrying a yellow plastic bag—"like a store bag"—and rejoined Lunas in the Volvo. (Tr. 17:19; 20:13-22.) Officer Hulmes got out of the Buick "to get a little better vantage point of what was going on." (Tr. 21:18-20.)

*Roebuck Takes "an Object" from His Pocket*

After a "couple of minutes," Roebuck again got out of the Volvo. (Tr. 21:13-16; 22:25-23:2.) Officer Bartle saw Roebuck, who was about 100 feet away, remove "an object" from his pocket. (Tr. 23:1-6.) Evidence concerning the "object" was confused and contradictory. When Officer Ramos later prepared the probable cause affidavit for a warrant to search the Volvo, he mistakenly wrote that Officer Hulmes had seen Roebuck "remove a large sum of U.S. currency" from his pocket. (Tr. 68:17-70:12; Gov. Ex. 16.) When speaking with Officer Hulmes before the suppression hearing, however, Officer Bartle learned that this was an error—that Hulmes could not see what was in Roebuck's hand. (Tr. 43:9-23; 69:3-22.) On direct examination, Bartle confirmed that he did not "know what it was" Roebuck took from his pocket:

> I could not see because of the conditions what that was. Officer Hulmes could only tell me it was an object.

(66:25-67:2; 23:4-7.) On cross-examination, however, Officer Bartle testified that although he "did not see money," and Officer Hulmes "didn't see money," the "object," some 100 feet distant, nonetheless "looked like" money:

> Q. What do you base that on?
> A. Based on the fact that it appeared to be folded up, the way that he held it, it looked like a wad of money. But I could not tell this Court denominations or color, but that's what it appeared to me to be. It didn't look like it was narcotics. It didn't look like it was a weapon. The only form I could—the only way I can explain it is it looked like it was folded up money.

(Tr. 67:10-13; 120:15-23).

This confusion and contradiction underscores that the police could not, at night, from a distance of 100 feet, make out what Roebuck took from his pocket.

*Continued Surveillance of Defendants*

Roebuck went back down the walkway. (Tr. 23:6-10.) Despite his efforts to get a better view, Officer Hulmes again lost sight of Roebuck once he entered the poorly lit walkway. (Tr. 23:9-10; 20:3-4.) Officer Bartle testified that "[a]t no point did we have eyes on Mr. Roebuck when he entered the alleyway. I attempted to get that but it was too dark for any of us to see at our vantage point once Mr. Roebuck entered the alleyway." (Tr. 65:3-6.) The officers did not see anyone else enter or leave the walkway. (Tr. 76:20-22.) About ten minutes later, Roebuck reemerged from the walkway, this time carrying a black plastic bag that was "kind of rolled up." (Tr. 23:23-24:1.) Once again, Roebuck entered the Volvo, where he and Lunas sat for about fifteen minutes. (Tr. 24:1-3.) At approximately 8:45 p.m., Lunas, still accompanied by Roebuck, drove the Volvo away. (Tr. 25:21-26:3.)

Officer Bartle acknowledged that when he spotted Roebuck at 8:00 p.m., it was "[n]ot particularly late," and that "it is not uncommon for people to walk the streets" at that hour on

those residential blocks. (Tr. 78:15-19.) He further acknowledged that "it wasn't really out of the ordinary what I saw [Roebuck] do," and that there "could have been sandwiches in the bags" Roebuck was carrying—that there "[c]ould have been anything in the bags." (Tr. 17:10-11; 79:10-14.) He also conceded that there was "nothing extraordinary about" Roebuck's taking something from his pocket. (Tr. 121:1-6.) He nonetheless believed that a narcotics transaction had taken place: "you put all three of them together [*i.e.*, Roebuck's trips to and from the walkway, the plastic bags, and the object in Roebuck's hand], what I'm seeing taking place in a dark alleyway, now, to me in my opinion, it's extraordinary." (Tr. 24:6-10; 121:16-19.)

*Vehicle Stop—Recovery of Evidence from Roebuck*

Officer Bartle radioed for "back-up uniformed officers" to make a traffic stop, and Officers Irizarry and Fagan stopped the Volvo at the nearby intersection of 17th and Erie Streets. (Tr. 30:9-31:24; 32:4-9.) When the officers activated their lights, "the vehicle complied and stopped." (Tr. 86:12-22.) Officer Bartle testified that when the officers signaled the Volvo to pull over, "the official investigation [began] and at that point they were not free to drive away until we conducted our investigation." (Tr. 87:6-10.)

As Officer Irizarry approached the Volvo, he heard "a thud coming from the back seat as Lunas was reaching back." (Tr. 33 7-8.) Irizarry and Fagan ordered Roebuck and Lunas out of the car. (Tr. 33:10-15.) When ordered by Officer Fagan to place his hands on the Volvo's hood, Roebuck instead pushed the officer and tried to flee. (Tr. 33:17-34:5.) As Bartle and Hulmes tackled Roebuck and sought to restrain him, Roebuck removed a clear plastic bag of cocaine from his pocket and threw it to the ground. (Tr. 34:23-35:14.) Once Roebuck was handcuffed, the officers recovered three more clear plastic bags of cocaine from his pockets, along with $421 in cash. (Tr. 36:21-37:10.)

*Vehicle Search—Recovery of Additional Evidence*

In the hours after the car stop and search of Roebuck, police prepared a warrant to search Defendants' Volvo. (Tr. 40:10-18.) Officer Ramos—who verified the warrant—based the "probable cause" section entirely on information provided by Officer Bartle. (Tr. 40:19-24.) The warrant thus includes a recitation of all the events I have just described leading up to and immediately following the car stop: both Defendants sitting in the Volvo, Roebuck's trips to and from the walkway; the car stop; Roebuck's discarding of a bag of cocaine after attempting to flee; and the recovery from Roebuck of three more bags of cocaine and $421 in cash.

The bail commissioner approved the warrant at 3:00 a.m. on November 3rd. (Tr. 42:2-6.) The officers executed the warrant at approximately 3:45 a.m., recovering more cocaine, crack cocaine, a .40 caliber Smith & Wesson magazine, and another $5,500 in cash. (Tr. 44:24-45:1; Gov. Ex. 21, 22.)

Mr. Goss disputed this chronology, testifying that the officers searched the Volvo before obtaining a warrant. I discredit his testimony. In any event, because Goss did not witness Roebuck's activities in the Volvo or near the walkway, his testimony is largely irrelevant to my legal conclusions.

## CONCLUSIONS OF LAW

Defendants argue, *inter alia*, that because the stop of the Volvo was illegal, I must suppress the evidence the police recovered both during their initial search of Roebuck and their subsequent search of the Volvo. At the suppression hearing, the Government conceded that if the initial car stop was illegal, I must suppress the physical evidence recovered from both Roebuck and the Volvo. (Tr. 130:8-21.) The Government nonetheless urges me to deny Defendants' Motions beccause the car stop comported with the Fourth Amendment, as did the

ensuing searches.

I do not agree with the Government. Because the police lacked reasonable suspicion to conduct the November 2nd traffic stop, they violated the Fourth Amendment. See Ohio v. Robinette, 519 U.S. 33, 39 (1996) ("We have long held that the touchstone of the Fourth Amendment is reasonableness.") (internal quotations omitted). Accordingly, I am compelled to suppress all the evidence obtained as a result of that stop.

   A.   *Legal Standards*

Warrantless searches and seizures "are presumptively unreasonable" and violate the Fourth Amendment. United States v. Mathurin, 561 F.3d 170, 173 (3d Cir. 2009); United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002). Evidence recovered in violation of the Fourth Amendment is "fruit of the poisonous tree" and must be suppressed. Wong Sun v. United States, 371 U.S. 471, 487 (1963); United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006).

Exceptions to the warrant requirement abound. Illinois v. McArthur, 531 U.S. 326, 330 (2001). The police "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). "The Terry exception to the warrant requirement likewise permits a police officer to conduct an investigative stop of an automobile if the officer has reasonable suspicion that its passengers are engaged in criminal activity." United States v. William, 360 F. App'x 320, 322 (3d Cir. 2010) (not precedential) (quoting Mathurin, 561 F.3d at 174). Both the driver of a vehicle and his passenger "have standing to object to the stop." United States v. Mosley, 454 F.3d 249, 253 (3d Cir. 2006).

"In evaluating whether reasonable suspicion existed, a court must consider the totality of the circumstances, including the police officer's knowledge, experience, and common sense judgments about human behavior." United States v. Navedo, 694 F.3d 463, 468 (3d Cir. 2012). "Under the reasonable suspicion standard . . . officers must be able to articulate reasons that led to the search that are indicative of behavior in which most innocent people do not engage." William, 360 F. App'x at 322 (quoting United States v. Whitted, 541 F.3d 480, 489 (3d Cir. 2008)). In performing a reasonable suspicion analysis, I may consider the facts known by all the officers involved in the challenged Terry stop. See, e.g., United States v. Belle, 593 F.2d 487, 497 (3d Cir. 1979) ("The collective knowledge of the investigating officers is measured in determining probable cause."); United States v. Thomas, 74 F. App'x 189, 191 (3d Cir. 2003) (not precedential) (citing Terry, 392 U.S. at 26) ("An officer is allowed to consider personal observations and the collective knowledge of several law enforcement personnel in determining whether reasonable suspicion exists."). "Though the individual factors giving rise to reasonable suspicion may be innocent in isolation, together they must serve to eliminate a substantial portion of innocent travelers." Mathurin, 561 F.3d at 174. Neither an officer's good faith nor "inarticulate hunches" can justify an otherwise impermissible stop. Terry, 392 U.S. at 22.

### B. *Absence of Reasonable Suspicion*

The Parties agree that the Volvo was seized for Fourth Amendment purposes when Officers Irizarry and Fagan stopped the car. (Doc. No. 325 at 15-16; Doc. No. 328 at 12; Doc. No. 331 at 8); see United States v. Smith, 575 F.3d 308, 312 (3d Cir. 2009) ("Any inquiry into an alleged seizure must begin by determining when the seizure occurred."); Mosley, 454 F.3d at 253 ("[I]t is settled law that a traffic stop is a seizure of everyone in the stopped vehicle.") (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)). The Government must thus show that the Terry

stop of the Volvo was reasonable. United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005); United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). The Government has not met this burden. Although the reasonable suspicion standard is less demanding than that of probable cause, "the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Wardlow, 528 U.S. at 123. The totality of the circumstances does not support a finding of objective justification here.

The events described by Officer Bartle—Roebuck's two trips to and from the Volvo and down a walkway—were not suspicious. (Tr. 17:10-11 ("[I]t wasn't really out of the ordinary what I saw [Roebuck] do.").) Officer Bartle acknowledged that it was "[n]ot particularly late" when he spotted Roebuck, and that "it was not unusual for people to walk" on this residential block at that hour. (Tr. 78:15-19); cf. United States v. Goodrich, 450 F.3d 552, 561 (3d Cir. 2006) ("lateness of the hour [11:30 p.m.] of the stop supports the inference of criminal activity" when considered with other factors). The officers could not see Roebuck and so did not know what he did once he entered the walkway. Bartle acknowledged that Roebuck's two plastic bags could have held "sandwiches" or "anything." (Tr. 79:11-14.) I have found that the police could not identify the object Roebuck removed from his pocket before he reentered the walkway. Although the officers had previously conducted surveillance and made arrests in Hunting Park, they had never before investigated the Ruffner Street area where they saw Defendants. Cf. United States v. Fleetwood, 235 F. App'x 892, 897-8 (3d Cir. 2007) (not precedential) (defendant drove from one known drug location and entered another).

Significantly, factors that commonly give rise to Terry stops were absent here. The officers were not responding to an informant's tip or a 911 call. Cf. United States v. Nelson, 284 F.3d 472, 482 (3d Cir. 2002) (tip from reliable informant supported Terry stop). On the contrary,

"it was dumb luck" that they happened upon Defendants. (Tr. 76:7.) Nor did Roebuck and Lunas behave nervously or attempt to flee when they first saw the police. (Tr. 86:12-22.); cf. Wardlow, 528 U.S. at 125-6 (flight plus other indicia of wrongdoing can give rise to reasonable suspicion); Fleetwood, 235 F. App'x at 898 (reasonable suspicion where defendants spotted police and began driving "nervously").

I understand that when considering the "totality of the circumstances" confronting police, the whole is often greater than the sum of its parts. See United States v. Arvizu, 534 U.S. 266, 274 (2002) (individual factors "readily susceptible to an innocent explanation" may collectively amount to reasonable suspicion). I am also acutely aware that Officer Bartle and his colleagues are vastly experienced in drug investigations, that Hunting Park is a "high crime area," and that the officers had only seconds to make their decision to stop the Volvo. Absent an objectively reasonable basis to suspect criminal activity, however, these factors would vindicate police stops of almost anyone carrying packages in a host of neighborhoods—often urban neighborhoods. See United States v. Montero-Camargo, 208 F.3d 1122, 1138 (9th Cir. 2000) ("The citing of an area as 'high-crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity.")

Without evidence that police saw Roebuck take money from his pocket, the Government bases its claim of reasonable suspicion on Roebuck carrying two plastic bags to the Volvo in a "high crime" neighborhood at night. This simply does not make out a "reasonable, articulable suspicion that criminal activity [was] afoot." Terry, 392 U.S. at 30. The Terry stop of the Volvo thus violated the Fourth Amendment. See United States v. Johnson, 620 F.3d 685 (6th Cir. 2010).

C. *Evidence to Be Suppressed*

Defendants ask me to suppress: 1) the four bags of cocaine and $421 recovered from Roebuck after he attempted to flee; and 2) the cocaine, crack, magazine, and $5,500 recovered during the search of the Volvo. I must thus determine whether either seizure was the result of the illegal Terry stop. Both plainly were.

"[E]vidence derived from constitutional violations may not be used at trial because illegally derived evidence is considered 'fruit of the poisonous tree.'" United States v. Pelullo, 173 F.3d 131, 136 (3d Cir. 1999) (quoting Wong Sun, 371 U.S. at 487-88). Such a "taint" analysis requires me to determine more than whether the challenged evidence "would not have come to light but for the illegal actions of the police." Brown v. Illinois, 422 U.S. 590, 599 (1975). Rather, the scope of exclusion is determined by a two-part inquiry: (a) the "proximity" of the illegal seizure to the evidence; and (b) whether circumstances subsequent to that seizure "provide a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been" tainted by that illegal arrest. United States v. Burton, 288 F.3d 91, 99 (3d Cir. 2002) (quoting Pennsylvania ex rel. Craig v. Maroney, 348 F.2d 22, 29 (3d Cir. 1965)). "The first inquiry assesses the measure of attenuation between illegal police conduct and the evidence allegedly exploited from it;" the "second inquiry concerns whether an independent source exists for that evidence." Id.

The Government argues only that the Terry stop was legal, thus apparently conceding that if the stop were unlawful, I must suppress the evidence recovered from Roebuck and the Volvo. See United States v. Dupree, 617 F.3d 724, 732 (3d Cir. 2010) (by failing to argue below the inapplicability of the fruit-of-the-poisonous-tree doctrine, the government waived that issue on appeal). I will nonetheless analyze each seizure under Burton.

There was no "attenuation" between the illegal Terry stop and the police recovering drugs and cash from Roebuck seconds later. Nor has the Government suggested a "source" from which they could have discovered the evidence "independent" of the stop. Accordingly, I am obligated to suppress the evidence recovered from Roebuck immediately after the illegal Terry stop.

Police recovered the evidence from Defendants' Volvo pursuant to a search warrant supported by an affidavit reciting events that "occurred as a direct result of the tainted [car stop]"—the "thud" heard by Officer Irizarry, Roebuck's attempt to flee, and the recovery of cocaine and cash from his person. United States v. Howard, 210 F. Supp. 2d 503, 518 (D. Del. 2002). The officers executed the search warrant just hours after the illegal car stop. The search of the Volvo was thus "directly preceded by and was directly dependent upon the [illegal] seizure" of the car. Id. Nor does the record suggest that the evidence was or could have been discovered from an independent source. See Burton, 288 F.3d at 99; United States v. Herrold, 962 F.2d 1131, 1140 (3d Cir. 1992) (evidence "discovered lawfully, and not as a direct or indirect result of illegal activity, is admissible").

In these circumstances, the drugs, ammunition, and money recovered from Defendants' Volvo cannot be said to be "untarnished by the constitutional violation." Pelullo, 173 F.3d at 136. Accordingly, like the drugs and money recovered from Roebuck, they must be suppressed.

D. *Absence of Miranda Warnings*

The Government concedes that Lunas's statements regarding his ownership of the Volvo "were made in the absence of Miranda warnings, which were required." The Government thus does not seek to introduce those statements at trial. (Doc. No. 335.) In these circumstances, I will also suppress Lunas's statements.

## CONCLUSION

Defendants' Motions to Suppress are granted.

An appropriate Order follows.

June 5th, 2013

*/s/ Paul S. Diamond*
_____
Paul S. Diamond, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Crim. No. 11-337-5, -9 |
| | : | |
| ANGEL LUNAS, JR. | : | |
| ANTHONY ROEBUCK | : | |
| | : | |

# O R D E R

**AND NOW**, this 5th day of June, 2013, upon consideration of Defendant Anthony Roebuck's Motion to Suppress Evidence (Doc. Nos. 129, 130), Defendant Angel Lunas, Jr.'s Motion to Suppress Evidence and Statements (Doc. No. 140), the Government's Responses (Doc. Nos. 160, 161), the evidence presented at the January 14, 2013 suppression hearing, and all related submissions (Doc. Nos. 325, 328, 331, 335, 375, 385), and for the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that the Defendants' Motions are **GRANTED**. Defendant Roebuck's request for a Franks hearing is **DENIED as moot**.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*
_____
Paul S. Diamond, J.